IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WILLIAMSON, | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 08-00284-CB-M |
| ALTAPOINTE HEALTH SYSTEMS, INC. | ) | |
| Defendant. | ) | |

**OPINION and ORDER**

This matter is before the Court on a motion for summary judgment filed by the Defendant, AltaPointe Health Systems, Inc. (Doc. 21)  At issue is whether Plaintiff can present sufficient evidence of gender discrimination to support the claims raised in the amended complaint.  After considering the undisputed evidence in the light most favorable to Plaintiff, the Court finds that the motion for summary judgment is due to be granted.

**Findings of Fact**

Defendant Altapointe Health Systems, Inc. (AltaPointe) provides mental healthcare at multiple locations throughout Mobile and Washington counties.  Plaintiff Christopher Williamson is a physician's assistant who was employed by AltaPointe[1] at BayPointe Hospital, from May 2006 to February 2007.  Williamson applied for a nurse practitioner position with AltaPointe in order to obtain assistance with repayment of student loans from the National Health Services Corps (NHSC).  To qualify for assistance, Plaintiff had to work for an NHSC-approved employer for two years.  Plaintiff found the position on an NHSC website and

---

[1]During the time period relevant to this action, Altapointe did business as "Mobile Mental Health Center."

contacted Dr. Sandra Parker, AltaPointe's medical director.  Initially, Dr. Parker had to determine whether a physician's assistant could be hired for a nurse practitioner's position.  Later, Dr. Parker called Williamson and invited him to submit a resume and to come in for an interview.  After the interview, Dr. Parker offered Williamson a position. Williamson was hired to assist Dr. Doug Ewing, a recently hired psychiatrist, in BayPointe's Adult Evaluation Unit (AEU).  Williamson's primary duties involved assisting with adult psychiatric patients in the AEU.[2]  Prior to coming to BayPointe, Williamson had no experience working in psychiatric care.

In September 2006, Dr. Parker invited Williamson to attend the "Adult Psychiatric Institute," a continuing education program presented by the Alabama Department of Mental Health and Mental.  By attending the seminar Williamson would have been able to obtain annual continuing medical education (CME) credits needed to maintain his physician's assistance (PA) license.  Dr. Parker subsequently learned that Williamson had registered for the seminar but had skipped all or part of it to work his second job as an organ harvester with an organ bank.  In January 2007, Williamson asked Parker to approve his attendance at a five-day PA conference in Philadelphia, Pennsylvania.  Dr. Parker refused Williamson's request because the conference did not focus on psychiatric medicine, which is the area in which Williamson needed training.

During the Fall of 2006, Dr. Parker began to receive complaints from Dr. Ewing regarding his own workload at the AEU.  Specifically, Dr. Ewing felt that involuntary commitment hearings were taking up too much of his time.  Because the AEU was an inpatient

---

[2]His duties also included occasionally providing general medical care to patients in BayPointe's children's unit.

unit, it was necessary for AltaPointe to have an experienced psychiatric healthcare professional at BayPointe who could testify at these hearings.  Dr. Ewing was the only psychiatrist at the AEU, and Williamson was the only PA or nurse practitioner.  Dr. Parker did not think Williamson was qualified to testify at commitment hearings due to his lack of experience in psychiatric medicine.

     Dr. Parker did not want to lose Dr. Ewing, so she began to think of ways of restructuring that would reduce Dr. Ewing's workload.  Eventually, the plan she came up with involved Dr. Ewing switching places with Dr. Abordo, a psychiatrist at another AltaPointe facility.  Dr. Abordo worked at Mobile Infirmary where he was assisted by two female nurse practitioners, Pat Noonan and Julia Trice.  Dr. Parker decided to transfer Noonan to BayPointe with Dr. Abordo.  Noonan had an extensive background in psychiatric medicine and had experience testifying at involuntary commitment hearings.  Therefore, Dr. Parker believed that Noonan and Dr. Abordo could work as a team and share testimonial duties.  Williamson was not transferred to Mobile Infirmary with Dr. Ewing, however, because Dr. Parker decided to eliminate both nurse practitioner positions at that facility.  In place of the two nurse practitioners, Dr. Parker transferred another psychiatrist, Dr. St. Phard, to Mobile Infirmary.  Thus, the workload formerly handled by one psychiatrist and two nurser practitioners would now be handled by two psychiatrists.  As a result of this restructuring, both Williamson and Trice were discharged.

     Williamson's termination became effective February 6, 2007.  He  was not discharged on account of his performance and had, in fact, received good evaluations while employed by AltaPointe.  He also received a positive recommendation from Dr. Parker after his discharge.  In March 2007, Williamson found on the NHSC website listings for nurse practitioner openings at

several AltaPointe facilities, including BayPointe Hospital and Mobile Infirmary. Williamson did not obtain further information about these openings, nor did he apply for any position with AltaPointe. He continued to work his second job with an organ bank, and was hired in mid-March of 2007 by United Surgical Assistants, a non-NHSC approved employer, earning higher salary than he had earned at AltaPointe. In the Spring of 2008, Williamson received a non-compliance letter from NHSC and shortly thereafter obtained a job with an NHSC-approved employer in Montana, earning considerably more than he did at AltaPointe.

**Issues Presented**

Plaintiff's amended complaint can be interpreted to assert three claims for gender-based employment discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, *et seq.* First, he contends that the restructuring and the resulting elimination of his job was a "ruse" for discrimination, *i.e.,* he was terminated on account of his gender. Second, Plaintiff complains that he was denied a lateral transfer or part-time position when his job was eliminated, although he does not specifically assert that this denial was on account of his gender. Third, Plaintiff asserts that he was treated differently in the terms and conditions of employment in that he was denied permission to attend CME courses, in contrast to a female employee.

Defendant seeks summary judgment on each of these claims, asserting that Plaintiff cannot meet his burden of proving intentional discrimination under the familiar *McDonnell Douglas* analysis. Plaintiff's response addresses his termination claim but not his two remaining claims. It is well-settled that claims not alleged in the complaint but not relied upon in summary judgment are deemed abandoned. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). For that reason, only the termination claim will be considered on the merits.

All other claims asserted in the complaint have been abandoned and, therefore, are due to be dismissed with prejudice.

**Legal Analysis**

### Summary Judgment Standard

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the nonmoving party bears the burden of proof at trial, the moving party must, at a minimum, "point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 n. 19 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)) (footnote omitted). If the moving party bears the burden of proof at trial, it "must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Id.* at 1438. In either situation, if the moving party meets its summary judgment burden, the non-moving party must come forward with evidence to demonstrate a triable issue of fact. *Id.* In reviewing that evidence, "the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).

**Title VII Framework**

When there is no direct evidence of discriminatory intent in a Title VII employment discrimination action, courts apply the familiar shifting burdens analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first present sufficient evidence to establish a prima facie case of discrimination.  That prima facie case creates a rebuttable presumption of discrimination.  The defendant must rebut this presumption by proffering a legitimate nondiscriminatory reason for its employment decision.  If the defendant rebuts the presumption, the plaintiff bears the burden of proving that the reasons given by the defendant are not the true reasons but are merely a pretext for discrimination.  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc).  To prove pretext, a plaintiff "must meet the employer's reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.* at 1030. Furthermore, "[plaintiff's] evidence must reveal 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Vessels v. Atlanta Ind. School System*, 408 F.3d 763, 770 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir.2004)).

Defendant first challenges Plaintiff's ability to prove a prima facie case.  "A plaintiff establishes a prima facie case of disparate treatment by showing that [ ]he was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson v. B/E Aerospace Inc.,* 376 F.3d 1079, 1088 (11th Cir. 2004).  Defendant points out that there are no similarly situated

employees who were treated more favorably than Plaintiff.  Three employees who occupied nurse practitioner positions were affected by the restructuring–Pat Noonan, Julia Trice and Plaintiff.  Julia Trice was discharged along with Plaintiff.  Pat Noonan was retained and transferred to Plaintiff's former position.  Noonan had considerably more experience in psychiatric medicine than Plaintiff, had worked closely with Dr. Abordo, the psychiatrist transferred to BayPointe, and, in contrast to Plaintiff, had the knowledge and expertise to testify at involuntary commitment hearings.  In sum, Noonan cannot be considered similarly situated to Plaintiff.  Because Plaintiff cannot identify a similarly situated female employee who was retained under similar circumstances, his prima facie case fails.[3]

Even if Plaintiff could prove a prima facie case of discrimination, he has failed to overcome Defendant's legitimate nondiscriminatory reason for Plaintiff's discharge.  Dr. Parker explained that the discharge resulted from the restructuring of the psychiatric staff.  The restructuring came about because of Dr. Ewing's complaints about the testimonial workload at BayPointe.  To alleviate that problem, Dr. Parker did two things.  First, she had Dr. Ewing switch jobs with Dr. Abordo.  Dr. Ewing moved to Mobile Infirmary, and Dr. Abordo went to BayPointe.  Second, Dr. Parker sent Pat Noonan, one of the two nurse practitioners who worked with Dr. Abordo, to Altapointe (essentially taking Plaintiff's nurse practitioner position) because Noonan was capable of sharing the testimonial workload with Dr. Abordo.  The restructuring did not end there.  Dr. Parker also  decided to eliminate the two nurse practitioner positions at the Infirmary and replace them with one psychiatrist.  As a result, two persons in nurse practitioner

---

[3]Plaintiff has offered no evidence of a prima facie case.  His summary judgment responses addresses only the issue of pretext, completely ignoring his initial burden of proof under the *McDonnell Douglas* analysis.

positions lost their jobs–Plaintiff and Julia Trice.

Plaintiff argues that the restructuring explanation is a pretext for discrimination and presents two pieces of evidence to support his argument.  First is a copy of job listings posted on the NHSC website in March or April of 2007.  Those listings show nurse practitioner openings with AltaPointe at BayPointe and Mobile Infirmary.  This evidence is rank hearsay, and for that reason should not even be considered on summary judgment.  *See Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir. 1999) (explaining that hearsay evidence may be considered on summary judgment only if it would fall within hearsay exception at trial).  Even if the evidence were admissible, these listings–dated more than a month after the discharge--prove nothing about the availability of positions at the time of Plaintiff's discharge.  Plaintiff's other pretext evidence is several revised drafts of a letter from Dr. Ewing to the Alabama Board of Medical Examiners (ABME).  It appears that the drafts were prepared by Dr. Parker and Dr. Ewing.[4]  The purpose of the letter was to inform the ABME that Dr. Ewing would no longer be Plaintiff's supervising physician. While the first draft stated that Plaintiff resigned from employment with Mobile Mental Health Center (AltaPointe's predecessor), subsequent drafts, and the final letter sent to the ABME stated that Plaintiff's job was eliminated due to restructuring. Plaintiff argues that these drafts prove that Defendant has offered varying explanations for his termination and, therefore, the reasons now proffered must be pretextual.  What they actually demonstrate is Defendant's effort to ensure that Plaintiff's termination would not be viewed in a negative light by the ABME.  No reasonable factfinder could conclude from this evidence that Defendant's

---

[4]The drafts and revisions are contained in a series of emails between Dr. Ewing and Dr. Parker's assistant.

claim of restructuring was merely a pretext for gender discrimination.

**Conclusion**

In response to Defendant's motion for summary judgment, Plaintiff has failed to present sufficient evidence to support any of his gender discrimination claims. Accordingly, the motion for summary judgment is due to be and hereby is **GRANTED**.

**DONE** and **ORDERED** this the 15th day of June, 2009.

s/*Charles R. Butler, Jr.*
**Senior United States District Judge**